UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S, ) <br> LONDON SUBSCRIBING TO ) <br> CERTIFICATE NO. IPSI 12559, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> SSDD, LLC, ) <br> ) <br> Defendant. ) | No. 4:13-CV-193 CAS |

**MEMORANDUM AND ORDER**

This matter is before the Court on plaintiffs Certain Underwriters at Lloyd's, London Subscribing to Certificate No. IPSI 12559's (collectively, "Underwriters") motion in limine to exclude the testimony of SSDD, LLC's ("SSDD") expert witness Donald J. Brayer. Underwriters contend that Mr. Brayer's expert report and testimony do not meet the standards for admissibility set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). SSDD opposes the motion and it is fully briefed. No party requested oral argument or an evidentiary hearing. The parties have submitted an extensive evidentiary record in connection with the motion, which includes Mr. Brayer's expert report and deposition. For the following reasons, plaintiffs' motion will be granted in part and denied in part.

**Background**

This is a declaratory judgment action in which Underwriters assert claims for rescission of a commercial property insurance policy (the "Policy") they issued to SSDD, based on alleged material misrepresentations and/or omissions in the Policy application (Count I). In the alternative to Count I, Underwriters seek a declaration that the Policy is void based on SSDD's alleged

concealment or misrepresentation of material facts concerning the property under the Policy's Commercial Property Condition A (Count II); and a declaration that all loss occurring after May 22, 2012 is barred by the Exclusion 2(m) of the Policy's Causes of Loss – Special Form, that precludes coverage for loss or damage caused by or resulting from SSDD's alleged neglect to use all reasonable means to preserve the property from further damage at and after the time of loss. SSDD filed its Answer, Affirmative Defenses and Counterclaim, asserting counterclaims for breach of the insurance contract and statutory vexatious refusal to pay. Missouri law applies to the case.

**Legal Standard**

The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702. The Eighth Circuit has explained that "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony," Weisgram v. Marley Co., 169 F.3d 514, 523 (8th Cir. 1999), and "favors admissibility if the testimony will assist the trier of fact[.]" Clark ex rel. Clark v. Heidrick, 150 F.3d 912, 915 (8th Cir. 1998). Doubt regarding "whether an expert's testimony will be useful should generally be resolved in favor of admissibility." Id. (citation and internal quotation omitted).

In Daubert, the United States Supreme Court interpreted Rule 702 to require district courts to be certain that expert evidence based on scientific, technical or other specialized knowledge is "not only relevant, but reliable." Daubert, 509 U.S. at 589. The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-93.

The Eighth Circuit Court of Appeals has stated that proposed expert testimony must meet three criteria to be admissible under Rule 702. "First, evidence based on scientific, technical, or

2

other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy." Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001) (internal citation omitted). "Second, the proposed witness must be qualified to assist the finder of fact." Id. (citation omitted). "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." Id. (internal quotation marks omitted). To meet the third requirement, the testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d).

**Discussion**

Underwriters move to exclude Mr. Brayer's expert report and testimony on the following grounds: (1) Mr. Brayer lacks specialized knowledge, skill, experience or training regarding surplus lines property underwriting and claims handling; (2) Mr. Brayer's testimony and opinion regarding materiality should be excluded because he applies conflicting legal standards; (3) Mr. Brayer's opinions are inadmissible as legal conclusions; (4) Mr. Brayer's opinions lack a sufficient factual basis as required by Rule 702(b), Fed. R. Evid.; and (5) Mr. Brayer's testimony is based in part on speculation or the presumed intent of Underwriters. The Court will address each argument in turn.

    1. Mr. Brayer's Qualifications as an Expert

Rule 702 states that an expert may be qualified by "knowledge, skill, expertise, training, or education." Whether a witness is qualified as an expert depends on whether the witness' training and experience demonstrate knowledge of the subject matter. Moran v. Ford Motor Co., 476 F.2d 289 (8th Cir. 1973). For an expert witness to be qualified based on experience, that experience must bear a close relationship to the expert's opinion. Schmidt v. City of Bella Villa, 557 F.3d 564 (8th

3

Cir. 2009). However, "An expert witness need not be an outstanding practitioner in the field nor have certificates of training in the particular subject." United States v. Rose, 731 F.2d 1337, 1346 (8th Cir. 1984).

Underwriters argue that Mr. Brayer lacks "knowledge, skill, experience, training, or education" to opine as to whether Underwriters' claims adjuster used proper claims adjusting procedures, because he has not adjusted claims or worked with surplus lines commercial property policies. The Court disagrees. Mr. Brayer has worked in the insurance industry for insurance companies in various capacities and as an independent consultant for a total of thirty-seven years. Mr. Brayer is, among other things, a Chartered Property Casualty Underwriter, a Registered Professional Liability Underwriter and an Associate in Claims. Mr. Brayer held a surplus lines broker's license for approximately twelve years and wrote policies and endorsements for surplus lines policies, spent ten years as a property underwriter, and testified he was closely involved with the claims department during that time. Although Mr. Brayer has never been employed as a claims handler, he testified he has seen hundreds of claims investigations and has often reviewed cases in conjunction with claims personnel "from the perspective of a claim handler." (Brayer Dep. at 112.) Mr. Brayer has been an expert witness in numerous cases including six property cases, two of which concerned surplus lines.

The Court concludes that Mr. Brayer possesses the knowledge, skill, and experience necessary to satisfy the threshold of admissibility under Rule 702. See, e.g., Huval v. Offshore Pipelines, Inc., 86 F.3d 454, 457-58 (5th Cir. 1996) (where witness had broad, general experience in the insurance industry, including 32 years of experience as an underwriter, accounts manager and underwriting manager for various companies, he was qualified as an expert even though he had no experience regarding two critical facts in the case: acting as an insurance agent where an insurance

4

consultant was involved, and working directly with a London broker); McDermott Int'l, Inc. v. Industrial Risk Insurers, 2008 WL 5120694, at *1 (E.D. La. June 18, 2008) (expert was qualified to testify as to reinsurance custom and practice, although his primary background was in claims handling, where he also had experience in insurance auditing in the field of reinsurance). See also Davis v. American Jet Leasing, Inc., 864 F.2d 612 (8th Cir. 1988) (holding that an individual who had been a licensed pilot since 1946, was the operator of a jet sales and leasing company similar to the defendant's for over ten years, and supervised the maintenance and repair of jets, had sufficient specialized knowledge to testify as an expert about the defendant's aircraft maintenance program. The fact that the witness was not an FAA-licensed mechanic and had no personal knowledge of the condition of the aircraft at issue went to the weight of the expert's credibility, not the admissibility of his testimony.). Mr. Brayer is qualified to offer expert testimony in this case under Rule 702.

    2. Conflicting Standards Regarding Materiality

Underwriters argue that Mr. Brayer's testimony and opinions concerning materiality are inconsistent because his report states that an objective standard is to be applied, while his deposition testimony advocates the application of a subjective standard. Underwriters contend this renders his testimony inherently unreliable and therefore inadmissible.

Specifically, Underwriters state that Mr. Brayer's report quotes two Missouri court decisions articulating an objective standard for determining if a misrepresentation is material, but Mr. Brayer testified that in forming his opinions he did not look to insurance industry standards, claiming "there are really no industry standards. There might be industry lore, there might be industry concepts, but each individual company has its own underwriting standards" which are determined by reviewing their underwriting manuals. (Brayer Dep. at 15:23-16:13.) Mr. Brayer testified that if a particular insurance "company does not have an underwriting manual, the insurer is pretty much relying on

5

the expertise of their underwriters[.]" (Id. at 16:16-21.) Underwriters state that Mr. Brayer also testified that underwriting standards differ between surplus lines carriers and the admitted market (id. at 13:2-22). Underwriters contend Mr. Brayer "splits his testimony" when he testified that "you really have to check to see what the . . . statutory or case law would define as material, but that aside, it would be something that an underwriter might if he or she had known would not have written the risk . . . or would have taken . . . a much different approach to the underwriting." (Id. at 68:2-14; 69:7-24.) Underwriters assert that the "clear conclusion" to be drawn from Mr. Brayer's testimony is that "surplus lines underwriting can be very subjective, turning on what might affect an individual underwriter," which cannot be reconciled with the objective standards set forth in the Missouri cases quoted in his report. Pls.' Reply at 6.

In addition to the deposition excerpts quoted by Underwriters, Mr. Brayer testified that his opinions were based on insurance industry customs and practices, and his expert report stated it would address "whether Underwriters complied with standard insurance industry customs and practices with respect to their underwriting, claim handling and attempted rescission" of SSDD's Policy. Under the heading of "Underwriting Standards," Mr. Brayer's report states:

> Although underwriting theory (measurements of risk) is quite consistent among commercial property underwriters, their appetite for risk can (and does) vary considerably. To get a clearer understanding of any individual insurer's underwriting standards, a review of its "underwriting guidelines" is usually required.

Brayer Report at 6.

Mr. Brayer's report discusses the differences between admitted insurers and Excess and Surplus ("E&S") lines insurers, and explains:

> The purpose of the E&S market is to write business that is higher risk because of its class (i.e. paint or solvent manufacturers, dynamite manufacture[r]s, etc.) or risks that are of poorer quality in an otherwise acceptable class (to the admitted market).

> Underwriters at Lloyd's of London are part of the E&S market for the most part. Their appetite for risk, in terms of kind and quality, is much greater than that of the vast majority of admitted insurers or even many other E&S insurers. The "Underwriters" in this case are a syndicate at Lloyd's of London and write in Missouri as an E&S insurer. We may safely assume that Underwriters are in the market to write risks that are, by and large, not acceptable to admitted insurers. The SSDD, LLC policy was written on an E&S basis.

Brayer Report at 7 (footnotes omitted).

Mr. Brayer's expert report offers few specifics regarding industry custom or practice for underwriting theory or measurement of risks other than to state that these are "quite consistent among commercial property underwriters." Mr. Brayer's report also states that E&S insurers such as Underwriters write risks that are generally unacceptable to admitted insurers, that underwriters at Lloyd's of London will write risks that are too high-risk for many other E&S insurers, and that it may be "safely assumed" Underwriters is in the market to write risks that are not acceptable to admitted insurers. Mr. Brayer's report and deposition testimony are consistent in stating that to understand a particular company's underwriting standards it is generally necessary to review its underwriting guidelines. Neither Mr. Brayer's report nor his deposition testimony offer any specifics regarding Underwriters' underwriting standards except as quoted above.

The Court interprets Mr. Brayer's report and testimony as indicating that there are general insurance industry customs and practices with respect to underwriting theory in the commercial property area, that each insurance company has its own variations as reflected in its underwriting guidelines or, in the absence of such guidelines, in the practice and experience of its underwriters, and that Underwriters write risks that are high-risk and unacceptable to standard, admitted insurers.

The Court does not agree with Underwriters' assertion that Mr. Brayer articulates two different standards of materiality in his report and deposition testimony. The Missouri decision quoted in Mr. Brayer's report articulates the following definition of materiality: "The test of

materiality is whether if stated truthfully the answer might reasonably influence an insurer to reject a risk or charge a higher premium. Whether the insurer in fact was influenced is not determinative. Industry custom may be considered in applying this test." Galvan v. Cameron Mutual Ins. Co., 733 S.W.2d 771, 773 (Mo. Ct. App. 1987) (citation omitted). As quoted above, Mr. Brayer testified consistently with this standard that a material misrepresentation "would be something that an underwriter might if he or she had known would not have written the risk . . . or would have taken . . . a much different approach to the underwriting."

Mr. Brayer's overall testimony is consistent with the "reasonable person" standard applicable to the determination of materiality under Missouri law. See Central Bank of Lake of the Ozarks v. First Marine Ins. Co., 975 S.W.2d 222, 225 (Mo. Ct. App. 1998) ("The standard is whether a reasonable person should have expected that the misrepresentation within the insurance application would influence the insurance company's decision to accept the risk and issue the policy and in determining the premium to charge–not whether the misrepresentation actually influenced the insurer."). Mr. Brayer's testimony recognizes that different insurers have different appetites for risk – an issue the Missouri courts also recognize. See Galvan, 733 S.W.2d at 773 ("There was evidence from the defendant that it is a company which insures low risk property and declines high risks."). The testimony does not, however, articulate a subjective standard for determining whether material misrepresentation has occurred.

    3. <u>Mr. Brayer's Materiality Opinion is a Legal Conclusion</u>

Underwriters next assert Mr. Brayer's opinion, that SSDD's alleged material misrepresentations "are not, in fact, material misrepresentations," is improper because it merely tells the trier of fact what result to reach with regard to the alleged misrepresentations. Underwriters also assert that because Mr. Brayer testified part of his understanding of what constitutes a material

8

misrepresentation was gleaned from Missouri court decisions, he is interpreting Missouri case law to determine whether SSDD's misrepresentations were material, which is an exercise reserved for the Court.

Under the Federal Rules of Evidence, opinion testimony is not inadmissible solely because it embraces an ultimate issue to be decided by the trier of fact. Fed. R. Evid. 704(a). This does not mean that all opinion testimony as to ultimate issues is admissible. In the case of an expert witness, the opinion must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Opinions that "merely tell the jury what result to reach" are not admissible because they are not sufficiently helpful to the trier of fact. See, e.g., Lee v. Andersen, 616 F.3d 803, 809 (8th Cir. 2010) (expert's opinion that photograph showed plaintiff did not have a gun in his hand was properly excluded, as it would not have assisted the jury but rather would have told it what result to reach).

Underwriters' first point is valid. Mr. Brayer may not offer an opinion that the alleged material misrepresentations by SSDD are not, in fact, material. Whether the alleged misrepresentations were material is an ultimate factual issue for the jury in this case. Mr. Brayer's opinion on materiality is inadmissible and will be excluded because it intrudes on the jury's role as factfinder and creates a serious danger of confusing or misleading the jury into substituting the expert's assessment for the jury's own assessment.

Mr. Brayer also cannot testify concerning the legal standard for material misrepresentation under Missouri law, as this would intrude on the Court's role to instruct the jury as to the law. See Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003). The portion of Mr. Brayer's report that quotes from Missouri court decisions is therefore excluded.

The Court, however, rejects Underwriters' second point, that Mr. Brayer's testimony is inadmissible because it is grounded in part on Mr. Brayer's understanding of Missouri law. It does not invade the province of the Court for an expert to testify that an insurance company departed from insurance industry norms, where the testimony is based in part on the expert's understanding of the requirements of state law. See, e.g., Hangarter v. Provident Life and Acc. Ins. Co., 373 F.3d 998, 1016-17 (9th Cir. 2004) (expert "did not improperly usurp the court's role by instructing the jury as to the applicable law" even though his "testimony that Defendants departed from insurance industry norms relied in part on his understanding of the requirements of state law"); Ford v. Allied Mut. Ins. Co., 72 F.3d 836, 841 (10th Cir. 1996) (concluding that defendant's expert witness was permitted to testify to "the issue of bad faith" by showing that the defendant relied on both "Iowa law" and "industry practice"); see also Specht v. Jensen, 853 F.2d 805, 809 (10th Cir. 1988) ("a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms."); Richman v. Sheahan, 415 F.Supp.2d 929, 945 (N.D. Ill. 2006) ("There is no doubt that under Rules 702 and 704 an expert may testify about applicable professional standards and the [opposing party's] performance in light of those standards."); Primavera Familienstifung v. Askin, 130 F.Supp.2d 450, 529 (S.D.N.Y. 2001) ("[I]t is proper for an expert to testify as to the customs and standards of an industry, and to opine as to how a party's conduct measured up against such standards."), abrogated on other grounds by Casey v Merck & Co., Inc., 653 F.3d 95 (2d Cir. 2011).

In sum, Mr. Brayer may testify as to underwriting standards in general, the materiality of specific information (such as real property having multiple addresses, or eviction proceedings of a tenant of real property) on underwriting decisions, and proper claims handling. See Cedar Hill

Hardware and Constr. Supply, Inc. v. Insurance Corp. of Hannover, 563 F.3d 329, 343 (8th Cir. 2009). Mr. Brayer may offer his opinion as to whether any of Underwriters' actions deviated from insurance industry customs and practices, id., but he may not testify that he has reached a legal conclusion that the alleged misrepresentations were not material.

    4. Mr. Brayer's Opinions Lack a Sufficient Factual Basis

Underwriters next argue that Mr. Brayer's opinions lack a sufficient factual basis for him to testify about whether SSDD's misrepresentations in the Policy application were material and whether Underwriters grossly mishandled SSDD's claims. Underwriters state that Mr. Brayer's opinions contained in his November 1, 2013 report, were based exclusively on his review of only four documents: the Amended Complaint (Doc. 5), SSDD's Answer, Affirmative Defenses and Counterclaim (Doc. 26), Michael Gibson's Examination Under Oath ("EUO"), and the Policy. Underwriters point out that Mr. Brayer's report states he would like to review Underwriters' claim file to be "able to arrive at any reasonable conclusions with respect to the 'vexatious refusal' issue," Brayer Report at 13, and that Mr. Gibson's EUO "does not offer sufficient facts for [Mr. Brayer] to come to any conclusions with respect to Underwriters' overall handling of the claims." Id. at 14. Underwriters state that despite a dearth of factual support, Mr. Brayer nonetheless "cobbled together his two opinions on November 1, 2013," and has not amended his report although he later reviewed additional materials. Underwriters contend that, accordingly, Mr. Brayer's opinions are not based on sufficient facts to be the product of reliable principles and methods, and would not assist the trier of fact in understanding the evidence or determining a fact in issue.

The Court has excluded Mr. Brayer's opinion as to the alleged material misrepresentations, and so considers only on his second opinion, that Underwriters grossly mishandled SSDD's claims. As a general rule, "the factual basis of an expert opinion goes to the credibility of the testimony, not

11

the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Nebraska Plastics, Inc. v. Holland Colors Americas, Inc., 408 F.3d 410, 416 (8th Cir. 2005) (quoted case omitted). However, "if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded." Lawrey v. Good Samaritan Hosp., 751 F.3d 947, 2014 WL 2489076, at *5 (8th Cir. 2014) (quoting Nebraska Plastics, id.). An expert opinion is fundamentally unsupported when it "fails to consider the relevant facts of the case." Nebraska Plastics, 408 F.3d at 416.

Here, Mr. Brayer testified that prior to preparing his report, he reviewed the four documents listed by Underwriters, including the exhibits attached to the Amended Complaint: the Policy; a loss notice for SSDD's vandalism claim; a police department investigation report; a loss notice for SSDD's fire claim; a fire department investigation report; a sixteen-page letter of December 28, 2012 from Underwriters' coverage counsel, Mr. Novak, explaining in detail Underwriters' coverage analysis with respect to each of SSDD's claims; and the Policy application. The Court finds that Mr. Brayer's second opinion, based on his review of the foregoing documents and in particular the December 28, 2012 letter, is not so fundamentally unsupported that it can offer no assistance to the jury.[1] Underwriters may challenge by cross examination the factual basis for Mr. Brayer's opinion that they "grossly mishandled" SSDD's claims.

5. Mr. Brayer's Testimony is Based on Speculation

Finally, Underwriters argue that Mr. Brayer's testimony should be excluded because it is based in part on speculation or on the presumed intent of Underwriters in engaging in certain

---

[1] Mr. Brayer's report and testimony offer no opinions as to vexatious refusal. As a result, the statement that he would need to review Underwriters' claim file in order to "arrive at any reasonable conclusions" concerning "vexatious refusal" is immaterial.

conduct. Underwriters identify as speculative Mr. Brayer's testimony that they grossly mishandled SSDD's claims by failing to properly investigate the facts regarding liens on the property and whether it was held in trust, and by relying on the multiple addresses relating to the property.

This argument is another challenge to the factual basis of Mr. Brayer's testimony. The Court has found that Mr. Brayer's testimony is not fundamentally unsupported. As a result, the Court will deny this aspect of Underwriters' motion. Underwriters may inquire into the factual basis of this testimony on cross examination.

**Conclusion**

For the foregoing reasons, plaintiffs' motion to exclude the testimony and opinions of defendant's expert Mr. Donald J. Brayer will be granted in part and denied in part. The motion is granted to the extent that the Court will exclude: (1) Mr. Brayer's opinion that the alleged misrepresentations by SSDD in the Policy application were not, in fact, material misrepresentations; and (2) any testimony concerning the legal standard for material misrepresentation or other legal standards under Missouri law. The motion will be denied in all other respects.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' motion in limine to exclude the testimony of defendant's expert witness Mr. Donald J. Brayer is **GRANTED in part** and **DENIED in part** as set forth herein. [Doc. 86]

                                           **CHARLES A. SHAW**
                                           **UNITED STATES DISTRICT JUDGE**

Dated this __7th__ day of July, 2014.